UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| VERLEAN W. RANDOLPH | * | CIVIL ACTION |
| VERSUS | * | NO. 19-11861 |
| ST. TAMMANY PARISH SCHOOL BOARD | * | CONMAG DIV. (2) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter was referred to a United States Magistrate Judge for all proceedings and entry of judgment in accordance with 28 U.S.C. § 636(c) upon the written consent of all parties.  ECF No. 9.  The Court held a trial, without a jury, on March 8–10, 2021 via videoconference due to the Covid-19 pandemic.

Plaintiff Verlean W. Randolph ("Randolph") filed this suit against her employer, St. Tammany Parish School Board ("the School Board"), alleging that defendant discriminated against her on the basis of her race, subjected her to harassment and a hostile work environment, and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, 42 U.S.C. § 1981, and La. Rev. Stat. § 23:967.  ECF No. 2, at 3–5.  The School Board denies that it discriminated against Randolph and contends that she was not promoted due to, among other things, her behavior, attitude, and unwillingness to take on additional duties. ECF No. 47, at 4–5.

At the beginning of the trial, the parties introduced Joint Exhibits 1-55 ("Exhibits"), which the court admitted.  ECF No. 49.  Plaintiff also introduced exhibits P-2 and P-3.  ECF No. 50.  The Court heard testimony from six witnesses:  Louis Boullion, Brian Kingrey, Darlene Bennett, Theressa Noustens, Ronald Randolph and Plaintiff Verlean Randolph.  ECF No. 52, at 1.

Defendant moved for directed verdict at the close of Plaintiff's case and at the close of all evidence. The Court denied the motions without prejudice.

Having considered the evidence adduced at trial, the record, the testimony of the witnesses, the arguments and written submissions of counsel, and the applicable law, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a). To the extent, if any, that any of the following findings of fact constitute conclusions of law, or vice versa, they are adopted as such.

## FINDINGS OF FACT

1.      Plaintiff Verlean W. "Tina" Randolph is an African-American woman who received a Bachelor of Science degree in Computer Science from Southeastern Louisiana University in 1992, a Master of Business Administration from the University of Phoenix in July 2001, and a Master of Science in Integrated Science and Technology from Southeastern Louisiana University around 2006. Exs. 3, at 2; 1, at 45; Trial Testimony ("Test.") of Verlean Randolph ("Randolph").

2.      The defendant St. Tammany Parish School Board is a political subdivision of St. Tammany Parish, State of Louisiana. Pretrial Order Stipulations, ECF No. 47, at 5.

3.      After hearing all of the witnesses' testimony, the court finds that the witnesses are credible and testified truthfully based on their recollections, with their differing positions resulting primarily from different perceptions of the underlying events and inferences drawn from same.

## Structure of the IT Department

4.      Louis Boullion has overseen Defendant's IT Department ("IT Department") since January 2002 as Director of Information Technology (2002-07) and Senior Supervisor of IT Department (2007-present). He worked for various companies in technology before working in

the IT Department.  He is the highest ranking individual and highest paid employee in the IT Department.  Exs. 32; 49, at 2–3; Test. of Louis Boullion ("Boullion").

5.     The IT Department has two branches: (1) programming and (2) systems administration.  The hierarchy within the programming branch of the IT Department when Plaintiff first joined Defendant was:  Programmer I, Programmer II, Lead Programmer, Programmer Analyst I, Programmer Analyst II, Lead Programmer Analyst, Systems Analyst, Assistant Director.  Ex. 3, at 40, 148; Tests. of Darlene Bennett ("Bennett"); Boullion.   While no testimony or exhibits provide the overall hierarchy of the systems administration branch, the evidence suggests that a computer technician is inferior to a Systems Administrator, who is inferior to the Lead Systems Administrator.  *See* Exs. 35–38, 46, 52.  Similar to the programming branch, there was an Assistant Director who supervised the entire systems administration for a portion of Plaintiff's employment in the IT Department.  *See* Test. of Boullion.

6.     The complexity of the job duties within the programming branch increases with each programmer level, with generally less complicated tasks performed by the Programmer I and more complicated tasks performed by the Programmer II or Lead Programmer.  The Programmer Analyst positions work similarly, with the less complicated assignments being addressed by the Programmer Analyst I and more complicated assignments by the Programmer Analyst II and Lead Programmer Analyst.  Tests. of Bennett; Boullion.  The Systems Analyst position involved more work analyzing databases and building and designing software specifications than the Programmer Analyst positions.  Tests. of Randolph; Bennett; Boullion.

7.     In the systems administration branch, the positions generally focus more on maintenance of hardware for the IT Department, ensuring computers and other technology hardware is properly running for users in the school system to access available software programs.

The Systems Administrator positions also perform "low level" programming, analyzing databases, manipulating data, or implementing new systems.  Tests. of Bennett; Boullion.  Mr. Boullion described the Systems Administrator position as a "jack of all trades."  Test of Boullion.

8.     Defendant hired Plaintiff to work as a Programmer I in its IT Department on January 3, 1994, promoted her to Programmer II on July 1, 1995, promoted her to Lead Programmer on July 1, 1996, and promoted her to Lead Programmer Analyst on July 1, 2000. Ex. 1, at 29, 53, 55, 61; Ex. 3, at 75.  Plaintiff has not been terminated; she is currently employed as a Lead Programmer Analyst for the IT Department.  Test. of Randolph.

9.     Defendant's job description for the Lead Programmer Analyst position, as evidenced by the 2004 job description which was the only version introduced into evidence, includes the essential job functions of responsibility for the maintenance and proper operation of production systems, supervising programming personnel in new programming or modifications, preparing program specifications, report layouts, input documents, etc. for assignment to subordinates, preparing computer programs including flow charting, coding, testing, implementation, and documentation, performing limited systems analysis, working with users and information technology personnel, for the development of new or revised systems.  Ex. 3, at 78. Plaintiff described her duties as Lead Programmer Analyst, in 2000, to include programming, coding, telephone support, writing program specifications, creating reports using code, and assisting with various print jobs.  Test. of Randolph.

10.    Over the last decade or more, Defendant shifted away from having the IT Department's programmers write or code the computer programs/software for operational functions and moved to purchasing commercial software for those functions.  The transition from on-site programming and coding to purchasing packaged, pre-built commercial software programs

has resulted in changes to programmer's duties, with the job duties today requiring less hands-on programming or coding of programs and more learning and maintaining the packaged software programs purchased by the IT Department and running reports on that software.  Tests. of Randolph; Bennett; Boullion.  Plaintiff acknowledged during her testimony that the amount of coding and building of software programs performed by the IT Department decreased when Defendant shifted to the purchase of commercial software.  In one of Plaintiff's evaluations, Plaintiff writes, "While I welcome the new software that has been implemented, it would be nice and challenging to have the opportunity to do more coding." Ex. 3, at 125.

11.     Over the course of time and with the proliferation of hardware distribution among employees and students, the work within the systems administration branch has increased.  For instance, during the Covid-19 pandemic, Defendant deployed approximately 42,000 chromebooks to enable teachers and students to conduct classes virtually, requiring additional hardware support. Test. of Boullion.

## Programming Employees and Reporting Hierarchy

12.     Defendant hired Darlene Bennett as a Programmer on January 16, 1989, promoted her to Programmer Analyst I on July 1, 1991, promoted her to Programmer Analyst II on July 1, 1992, promoted her to Lead Programmer Analyst on July 1, 1991, promoted her to Systems Analyst on July 1, 2000, and promoted her to Assistant Director on July 1, 2002, which position she held until her retirement in July 2019.  Ex. 3, at 176; Test. of Bennett.  Darlene Bennett did not receive any promotions after her July 2002 promotion to Assistant Director.  Test. of Bennett. At retirement, Ms. Bennett's annual salary was $91,746.   Pretrial Order Stipulations, ECF No. 47, at 5.

13.     Plaintiff has not received a promotion since 2000, although she has received incremental pay raises. Ex. 1, at 6–14. She earned $63,373 in 2018 and $64,983 in 2019. Pretrial Order Stipulations, ECF No. 47, at 5. Her gross salary for those years was $74,709. Test. of Randolph. In her current position as Lead Programmer Analyst, Plaintiff is currently the second-highest paid employee in the IT Department, with only Mr. Boullion paid more than her. Tests. of Randolph; Boullion.

14.     Theressa Noustens worked as a Lead Programmer in the IT Department from 1995-2000 and from 2003-2015. Ex. 3, at 30; Test. of Theressa Noustens ("Noustens"). Ms. Noustens did not receive a promotion the entire time that she worked in the IT Department (i.e., 1995-2000; 2003-2015). Test. of Noustens.

15.     When Plaintiff began her employment in the IT Department as a Programmer I, Darlene Bennett was already the Lead Programmer Analyst and had been working in Defendant's IT Department for almost 5 years. Plaintiff, Noustens and Bennett were coworkers/peers until Bennett was promoted to Assistant Director in 2002 at which point she became Plaintiff's and Noustens's immediate supervisor. Test. of Bennett. While coworkers, Plaintiff, Bennett and Noustens were friendly with one another, often having lunch with one another and confiding in one another about their work as well as their personal lives. Tests. of Randolph; Noustens; Bennett.

16.     Louis Boullion served as Plaintiff's (and Noustens's until 2015) indirect supervisor from 2002 to 2019 while Bennett was the immediate supervisor. Boullion became Plaintiff's immediate supervisor after Bennett retired in July 2019. Tests. of Bennett; Boullion.

17.     In light of technological progress and changes within the IT Department in response to that progress, the programming branch workload has evolved with less need for building and

coding of software within the Department, while the systems administration branch workload has increased with employees and students throughout the school system using more hardware. *See* Tests. of Randolph; Bennett; Boullion. These changes have resulted in less need for certain positions within the programming branch and the creation of more Systems Administrator positions within the systems administration branch. *See* Tests of Boullion; Ex. 41.

18.  With the increased use of commercial software and the lack of a need to build their own programs, Mr. Boullion did not believe the IT Department needed a Systems Analyst any longer, so when he promoted Ms. Bennett to Assistant Director in 2002, he informally dissolved that position and has not hired anyone to serve in that role since 2002. Tests. of Bennett; Boullion.

19.  Cognizant of the impact the gradual shift from coding to purchasing pre-packaged commercial software was having on the systems administration branch, Ms. Bennett recommended promotions to Systems Analyst for both Plaintiff and Noustens several years ago. Tests. of Randolph; Bennett. Ms. Bennett's recommendations, however, were not approved, and neither Plaintiff nor Noustens was promoted. Tests. of Bennett; Randolph; Noustens.

20.  Mr. Boullion eliminated the position of Assistant Director of Systems Administrators when A.J. Hankel retired around 2014. Instead of replacing Mr. Hankel, Mr. Boullion reorganized the department to promote two computer technicians to Systems Administrators and hire a new Systems Administrator rather than replace the Assistant Director. Ex. 41.

21.  In January 2019, Mr. Boullion advised Plaintiff that he similarly planned to hire a new Systems Administrator in lieu of filling the Assistant Director position when Ms. Bennett retired in July 2019. Exs. 54; 55.

22.     After Ms. Bennett retired in July 2019, Mr. Boullion did not fill the Assistant Director position.  Test. of Randolph; Boullion.  Mr. Boullion does not believe any current employee has the necessary skills and qualifications to perform the tasks required by that position. Test. of Boullion.

### Plaintiff's EEOC Charge

23.     On March 11, 2019, Plaintiff filed a Charge of Discrimination with the Louisiana Commission on Human Rights and EEOC alleging racial discrimination and retaliation starting July 2, 2018 to February 1, 2019, the most recent instance of discrimination at the time of the EEOC charge. Ex. 3, at 171.

24.     In her EEOC charge, Plaintiff asserted that she had been "discriminated against because of my race (Black), and retaliated against in violation of Title VII . . ."  She indicated that, in July 2019, she was denied a promotion by her supervisor, Louis Boullion, because he discontinued a job to which she could have been promoted while he created positions for other less experienced, less qualified white coworkers.  She also alleged that she was written up in February 2019 for discussing that issue with Mr. Boullion.  Ex. 3, at 171.  Plaintiff believes the reason she was not promoted to Assistant Director when Ms. Bennet retired in July 2019 is due to her race. *Id.*; Exs. 54; 55; Test. of Randolph.

25.     Plaintiff's charge does not identify the particular position she sought.  She signed her charge on March 11, 2019, but refers to a July 2019 failure to promote. Ex. 3, at 171.  Although the Systems Analysts position had been vacant since 2002, the July 2019 reference presumably refers to the Assistant Director position that she anticipated would be vacant in July 2019 when Ms. Bennett retired.

8

26. The EEOC was unable to conclude that the information established a violation of the statutes, but made no finding as to Defendant's compliance with the statutes. It issued a Dismissal and Notice of Rights on April 30, 2019. ECF No. 2-2.

27. Plaintiff filed a Complaint a few months later, setting forth claims of race discrimination and retaliation as well as allegations of harassment and hostile work environment based on race. ECF No. 2. She contends that she has "objected to various race-related commentary in the workplace" and has "always been passed over for promotion." *Id.* ⁋ 6, at 2; ECF No. 47, at 2–3. She also alleged that Defendant "began a continuous pattern of discrimination harassment and retaliation because of plaintiff's race." ECF No. 2, ¶ 7, at 2; ECF No. 47, at 3.

## Race Discrimination:  Hostile Environment

28. Plaintiff produced no evidence of derogatory racial comments directed at her by Louis Boullion in connection with any employment decision or even during her employment. Tests. of Randolph; Brian Kingrey ("Kingrey"); Noustens.

29. Plaintiff testified about three race-based comments or incidents involving her former supervisor Darlene Bennett during the course of their 25 years of employment together. Plaintiff did not contemporaneously report any of those three incidents to Defendant.

30. Theressa Noustens never heard a derogatory or inappropriate racial comment made at the IT Department. Test. of Noustens.

31. While Brian Kingrey, who worked as a computer technician within the IT Department from 2014–2015 and a Systems Administrator from 2015–2018, testified he recalled a political conversation with racial overtones (i.e., discussion regarding the removal of confederate statues), he did not state Plaintiff was present. Other than that one conversation, he never heard any derogatory or inappropriate racial comment while at the IT Department. Test. of Kingrey.

9

32.     No one testified that they witnessed anything indicative of Plaintiff being treated differently based on her race.

33.     Plaintiff did not identify any race-based comment or remark by Mr. Boullion. Plaintiff cites to two instances that Mr. Boullion "disrespected her," both of which appear to be the result of differences of opinions or failures to communicate rather than race-based animus. The first was in 2004 when, on a report card day, Plaintiff called in absent, without prior notice, when she had to take her mother to the doctor.  Mr. Boullion criticized Plaintiff's absence without notice.  Rather than view the issue from Mr. Boullion's perspective of having an employee absent without prior notice, Plaintiff became defensive.  At trial, she again characterized the issue as Mr. Boullion attacking her for attending to her mother's medical needs rather than recognizing that her absence without notice precluded the IT Department from making alternate plans for the work day, which in that instance involved a busy workday of issuing report cards.  Tests. of Randolph; Boullion.  The only other incident occurred around 2004 when Plaintiff parked in Mr. Boullion's regular (but unmarked) parking spot.  Mr. Boullion parked his car behind Plaintiff's and blocked her car.  Mr. Boullion thought his secretary had emailed everyone that he needed the spot because he is regularly called out of the office and he was evidently angry that Plaintiff ignored that message.  After Mr. Boullion discovered that his secretary had not sent an email to everyone, he apologized to Plaintiff.  Tests. of Randolph; Boullion.  These incidents occurred outside the relevant 300 days before Plaintiff filed her EEOC charge and are insufficient to support an inference that Mr. Boullion harbored any racial animus or discrimination against Plaintiff based on her race.

34.     Plaintiff did not identify any race-based comments or issues with any IT Department employee other than Ms. Bennett.  As to Ms. Bennett, Plaintiff identified three race-

based comments/incidents.  First, shortly after Plaintiff began to work for Defendant in 1994, her then co-worker Darlene Bennett made an inappropriate racial joke.  (Ms. Bennett denied the incident.)  Plaintiff testified that she "laughed it off" without indicating to Ms. Bennett that the joke was offensive.  The second incident cited by Plaintiff occurred around 2012, according to Plaintiff, when Plaintiff was scrolling through Ms. Bennett's pictures on her cell phone and saw a racially offensive photo.  (Ms. Bennett explained that, while on a plantation tour, she had photographed some items including an extremely offensive sign regarding the sale of slaves.)  On a third occasion, in 2010, Ms. Bennett told Plaintiff that her father calls her bi-racial nephew "Sambo."  Although Plaintiff said nothing during the conversation, she later wrote Ms. Bennett a letter telling Ms. Bennett that she found the comment offensive.  Tests. of Randolph; Bennett; Ex. P-2.

35.     Given the unrefuted testimony that Plaintiff, Ms. Bennett and Ms. Noustens were friends when co-workers from 1994-2002, the fact that Ms. Bennett recommended that Plaintiff (and Ms. Noustens) be promoted, and the many favorable evaluations by Ms. Bennett over the 17 years that she served as Plaintiff's immediate supervisor, these three incidents over the course of 25 years, with the most recent being in 2012, are insufficient to support an inference that Ms. Bennett harbored any racial animus or discriminated against Plaintiff based on her race.  Further, none of these comments was within 300 days of Plaintiff's EEOC charge nor in connection with any employment action at issue.

36.     Several witnesses testified that working in the IT Department is highly stressful and at times "hostile."  However, no witnesses testified that the IT Department's stressful or hostile environment was based on anyone's race or racial animus rather than on the conditions and demands of the work.  Further, when Plaintiff was asked about a hostile environment and the

overall work culture, she stated: "My charge is not for a hostile work environment, it's discrimination and retaliation . . . ."

37.     While the Court finds Plaintiff and her husband, Ronald Randolph, credible in their belief that Plaintiff has suffered physically and mentally in recent years as the result of her work environment, Plaintiff's subjective belief that she has experienced a hostile work environment because of her race rather than the job conditions is insufficient to establish a hostile work environment under Title VII.

## Race Discrimination:  Failure to Promote Claim

38.     Plaintiff contends that Mr. Boullion should have promoted her to the Systems Analyst position when Ms. Bennett was promoted from that position in 2002.  ECF No. 47, at 3; Test. of Randolph.

39.     Mr. Boullion saw no need for a Systems Analyst in 2002 as the Defendant no longer developed its own programs and instead purchased commercial software.  Test. of Boullion; *see also* Test. of Bennett.

40.     Defendant did not hire anyone to fill the Systems Analyst position since 2002. Tests. of Randolph; Bennett; Boullion.

41.     Plaintiff also contends that she should have been promoted to the Assistant Director position when Ms. Bennett retired in July 2019.  ECF No. 47, at 3; Test. of Randolph; *see* Ex. 3, at 171.

42.     As of the date of this trial, Mr. Boullion has not hired anyone, or promoted anyone within the IT Department, to fill Ms. Bennett's or Mr. Hankel's Assistant Director positions.  He does not think any current employee is presently qualified or has the skill set necessary to fulfill the demands and duties associated with the Assistant Director position.  Test. of Boullion.  There

is no evidence that Mr. Boullion is actively seeking candidates to fill that position. To the contrary, Mr. Boullion indicated his desire to hire new systems administrators rather than a new Assistant Director. Exs. 54; 55.

43.     Plaintiff did not introduce evidence (either through testimony or exhibits) of the job duties or job description for the Assistant Director position. Rather, Plaintiff relied on her assertion that she was "as qualified" as Ms. Bennett was for the Assistant Director position when she was promoted in 2002. Test. of Randolph.

44.     Absent a job description, it is difficult to determine the precise requirements for the Assistant Director position or to discern whether Plaintiff possesses those qualifications. From the various witnesses' testimonies, it appears that the Assistant Director serves as the supervisor over programming employees in the IT Department. Test. of Bennett; Boullion. The Assistant Director position requires communication and collaboration with various individuals across the St. Tammany Parish school system and within the IT Department to manage various programs for payroll, online courses, transcripts, scheduling, mandatory state reporting, and other functions for the Defendant's school system. Test. of Bennett. It requires hardware support skills, the ability to troubleshoot, and a good ability to communicate with employees and parents. The ability to work with others is also an important part of the Assistant Director position. Mr. Boullion valued Ms. Bennett's ability in the Assistant Director role to learn maintenance of hardware, in addition to her programming skills, and step-up to solve hardware and programming issues when he was out of the office. Test. of Boullion.

45.     Neither Plaintiff's job description nor her testimony provided any evidence that her job duties, experience or education include knowledge, training or skills for hardware support.

46.    None of the programming positions below Assistant Director are supervisory roles; rather they generally differ based on the complexity of programming tasks or analysis.  Test. of Bennett.

47.    Plaintiff regularly performed the duties of Lead Programmer Analyst.  Test. of Randolph; Test. of Bennett; *see* Exs. 19–31.  While the job description of Lead Programmer Analyst includes supervising other employees, Plaintiff did not offer any evidence to demonstrate that she exercised supervision over other employees in the department.  Rather, Plaintiff herself and two former coworkers testified that Plaintiff would help them when asked. Tests. of Kingrey; Noustens.

48.    The Assistant Director position entails interacting with staff, students and parents and requires the ability to maintain good rapport despite constant criticism.  Test. of Boullion.

49.    Plaintiff's performance evaluations have been excellent or satisfactory overall for most of her time with Defendant.  For instance, in Plaintiff's evaluations in 2009 (Ex. 3, at 125), 2010 (*Id.* at 126), 2011 (*Id.* at 128), 2012 (*Id.* at 129), 2013 (*Id.* at 131), 2014 (*Id.* at 133), 2016 (*Id.* at 139), 2017 (*Id.* at 144), and 2018 (*Id.* at 146), Ms. Bennett marked satisfactory or excellent in working as team player with all levels of the staff, tactful and courteous when accepting or giving directions, possesses the ability to supervise when necessary (except in 2007 when it was "Not Applicable" (*Id.* at 121)), and maintains positive rapport with coworkers.  She has, however, received some negative comments in certain categories.  Specifically, her 2004 evaluation noted that Plaintiff "Needs Improvement" in maintaining positive rapport with coworkers, working as a team player with all levels of staff, and is tactful and courteous when accepting or giving directions.  Ex. 1, at 158.  In an attachment to the evaluation, Ms. Bennett specifically wrote, "I would also like to see her contribute more within her current capacity with respect to team work and

14

interaction with coworkers as this component is also critical to the success of the department." *Id.*
at 159.   Then again in her 2019 evaluation, Plaintiff received a "Needs Improvement" for
maintaining positive rapport with coworkers, accepts suggestions or criticism, and works as a team
player with all levels of the staff.   That evaluation also reflected a "Not Applicable" on possesses
the ability to supervise when necessary.   The notes reflect: "Tina continues to isolate herself from
other IT coworkers this fiscal year and has become unapproachable. Tina . . . has not contributed
in a group task."   Ex. 1, at 168.

50.      In Plaintiff's words, "[E]verything is not an argument with me. I get along well
with other people, but if you come at me, I am going to come back at you." Exs. 54; 55.   When
Plaintiff received negative feedback in reviews, she appeared to employ an approach where she
denies the supervisor's criticism and places the blame on the Department or coworkers rather than
accepting the criticism as a constructive effort to improve performance.   For instance, in the vast
majority of instances in which Plaintiff received negative comments on evaluations, even overall
good evaluations, she responded to negative comments by disputing the validity of the criticism
rather than attempting to see the issue from the evaluator's perspective or responding with changes
she will make moving forward.   For instance, in response to the 2004 evaluation where Ms. Bennett
stated that Plaintiff should concentrate more on team work aspect of her job, and bring the "same
level of competence to promoting a friendly working environment . . . as she brings to her overall
technical performance," Plaintiff stated: "[H]aving experienced being consistently ostracized,
management has not been successful in nor has provided an environment conducive to promoting
rapport among coworkers equitably and with respect. . . . I am very much a team player, even when
I am not treated as part of the team."   Ex. 1, at 160.   Likewise, in 2019, in response to Ms.
Bennett's statement that Plaintiff "continues to isolate herself . . . has become unapproachable . . .

15

curt during individual and group discussions," Plaintiff states that any lack of job performance is due to receiving minimal directions and being excluded from training, and she places blame on Ms. Bennett: "Darlene's historical gross mismanagement of time . . . discredit[s] her ability to evaluate my time management and decision making skills," and "[t]he personal traits where Darlene indicates improvement is needed is a contradiction to her own actions because she often interrupts discussions between me and other co-workers." Ex. 1, at 170–71. And while Plaintiff disputes the evaluator's perception that she sometimes isolates from other workers, her own husband testified about her isolating herself from him and the rest of the family. Test. of Ronald Randolph.

51.     On January 23, 2019, Plaintiff approached Louis Boullion to discuss her future in the Department. Plaintiff secretly recorded the meeting with Mr. Boullion, so Plaintiff was aware that the meeting was being recorded but Mr. Boullion was not. The audio recording of that exchange (Ex. 54) reflects numerous instances in which Plaintiff interrupted Mr. Boullion and became somewhat confrontational during the exchange.

52.     Review of the recorded January 23, 2019 interaction supports Mr. Boullion's explanation of his perception that Plaintiff is not "a team player," suggesting he looks for employees to go above and beyond the minimum required to perform the job when he explains:

| | |
|---|---|
| Plaintiff: | Well, if my job assignment doesn't require me to stay late, what am I going to stay late for? |
| Boullion: | It's not just your job assignment. |
| Plaintiff: | I don't do systems administrator work. |
| Boullion: | You only work on exactly what's assigned to you. You don't ever come ask for additional work, you don't ever say, "Is there something else I could help you with?" I don't ever get that from you. |
| Plaintiff: | And I'm supposed to come to a systems admin - - |
| Boullion: | No! |
| Plaintiff: | - - and ask is there something I can you help with? |
| Boullion: | You could come to me! |

16

Exs. 54, 55; *see also* Ex. 1, at 20, 22.

53.     When Mr. Boullion advised that the IT Department would hire another Systems Administrator rather than replace Ms. Bennett and "everybody's going to pick up the work, including you," rather than responding by accepting the challenge for the good of the Department, Plaintiff responded by asking for additional compensation even though she is the second highest paid employee in the Department. Exs. 54; 55 at 5; 1, at 26. This response can be interpreted as lacking the "team player" mentality and representing an employee who is not willing to do more than the minimum necessary.

54.     While the Court does not doubt that Plaintiff believes that her race is the reason Mr. Boullion did not promote her to Assistant Director when Ms. Bennett retired, that subjective belief is insufficient and the evidence does not support that inference.

55.     Mr. Boullion has stated that Plaintiff lacks the necessary skills to serve as the Assistant Director, specifically that she lacks skills to troubleshoot hardware, lacks the skills needed to manage others, and has struggled to be a "team player" within the IT Department. Test. of Boullion; *see also* Test. of Bennett (stating that Plaintiff struggled to be a "team player."). These articulated reasons are legitimate, nondiscriminatory reasons for not promoting Plaintiff.

56.     Plaintiff has failed to demonstrate that Mr. Boullion's nondiscriminatory reasons for not promoting her constitute pretext. Mr. Boullion's perception that Plaintiff lacks hardware knowledge and skills is supported by Plaintiff's own testimony, admissions, her description of her job duties, and the Lead Programmer Analyst job description.

57.     Mr. Boullion's perception that Plaintiff struggles to be a team player and communicate with others is also supported by the evidence. While Plaintiff and Mr. Boullion draw different inferences from the evidence and from their interactions, there is no evidence to indicate

that Mr. Boullion does not honestly believe that Plaintiff lacks the necessary hardware training or knowledge, "team player" attitude, and communication or collaborative skills necessary to serve as Assistant Director of the IT Department.  Whether Mr. Boullion is correct in his assessment of Plaintiff's skills or whether that assessment is fair is not the issue.  The issue is whether he honestly believes that assessment and whether that is the reason for his decision not to promote Plaintiff to the Assistant Director position.

58.     Although Mr. Boullion has promoted employees within the Systems Administration branch of the IT Department, those promotions were awarded after an application process, and those IT Department members who received promotions into Systems Administration roles were first computer technicians with hardware skills, not employees from within the programming branch.  Test. of Bennett; Boullion; *see* Exs. 41, 35–38, 46, 51–52.  Mr. Boullion testified that it is policy that, if anyone within the IT Department applies for an open position, the employee will receive an interview.  Test. of Boullion.

59.     Plaintiff did not apply for any open positions within the Systems Administration branch of the IT Department.  Test. of Boullion.  She also has stated "I don't do systems administrator work" (Ex. 54; 55), and "I was not hired to be a systems administrator and have not been trained to work as one. . . . [and s]ystems administration is not my area of expertise as I was hired to develop software and support usage." Ex. 1, at 23.  In contrast, the employees who were promoted within the Systems Administration branch of the IT Department applied for the open positions.  Test. of Boullion.  Further, Plaintiff has presented no evidence of the requirements for those positions nor the qualifications of those hired or promoted into the unspecified positions within Systems Administration.

60.     Plaintiff did not provide evidence that a similarly situated employee working in the IT Department during the relevant time period, from May 15, 2018 to March 11, 2019, was treated more favorably than her.

61.     Ms. Noustens is not a similarly situated employee as she left the IT Department in 2015.  Even if she were, like Plaintiff, Ms. Noustens did not receive a promotion in the IT Department since she first joined in 2000.

62.     As Plaintiff's supervisor from the years 2002 to 2019, Darlene Bennett is not similarly situated to Plaintiff as their job duties and responsibilities differ.  Tests. of Randolph; Bennett.  Further, while Plaintiff may believe she is "just as qualified" as Ms. Bennett was when she was promoted to Assistant Director in 2002, Plaintiff fails to recognize the technological progress and changes within the Department during the last 17+ years.

63.     The other individuals identified by Plaintiff as witnesses or in exhibits – Brian Kingrey (Ex. 52); Lisa Cuevas (Exs. 35; 36), Jessica Johnson (Exs. 37; 38; 50), Joseph Rogers (Exs. 39; 40; 53); Melissa Cuevas (Ex. 46); Charles Sterling (Ex. 47); and Lynn Coyne (Ex. 48) – are not similarly situated employees as they are Systems Administrators, not Lead Programmer Analysts.  As such, they are in the systems administration branch of the IT Department and have different skills, job descriptions and position hierarchy within the Department than the programmer branch where Plaintiff works.  While there have been promotions within the Systems Administration branch, Plaintiff did not apply for any of those positions, and based on her own testimony, would not have been qualified for same.  Plaintiff also did not forward any evidence of a request to be trained as a Systems Administrator.

**Retaliation**

64.     Plaintiff also contends that she was retaliated against for (1) asking for a promotion in a January 23, 2019 meeting (Exs. 54; 55) and (2) for filing her EEOC charge on March 11, 2019. During the secretly recorded meeting on January 23, 2019, when discussing Ms. Bennett's retirement, Mr. Boullion told Plaintiff: "We are not going to replace her. We're going to hire another system admin just like we have before, and everybody's going to pick up the work, including you." Ex. 55, at 5.   Accordingly, as of January 23, 2019, Mr. Boullion had already decided, and told Plaintiff, that he would not replace Ms. Bennett.   Mr. Boullion made a similar decision in adding systems administrator positions instead of replacing the Assistant Director of systems administration, A.J. Hankel, several years earlier.  Test. of Boullion; *see* Ex. 41.

65.     Plaintiff did not file her EEOC charge of discrimination until March 11, 2019. Accordingly, Mr. Boullion's decision not to fill the Assistant Director position, which he told Plaintiff about on January 23, 2019, cannot be retaliatory as it pre-dated the protected activity.

66.     After the January 23, 2019 meeting, Mr. Boullion issued a letter of reprimand on February 1, 2019, and placed it in Plaintiff's personnel file. Ex. 1, at 20.  In this letter, Mr. Boullion asserts that Plaintiff "loudly challenged" him on why others in the department had been promoted and she had not and characterized Plaintiff's conduct as confrontational and disrespectful.  *Id.* at 20–21.

67.     Plaintiff also points to the negative June 2019 evaluation.  Ms. Bennett prepared the evaluation, but because Plaintiff was on leave when Ms. Bennett retired, Mr. Boullion delivered Ms. Bennett's evaluation. Tests. of Randolph; Bennett; Boullion.

68.     In the June 2019 evaluation, Plaintiff received less than satisfactory marks on numerous items where she had previously received satisfactory or excellent.  Ms. Bennett also

prepared a letter to assist Mr. Boullion in delivery of the evaluation since it would be delivered following her retirement. The letter and evaluation described Plaintiff's attitude as "unapproachable" and "curt" and Plaintiff acted "combative" during meetings with Ms. Bennett and other staff. Ex. 1, at 168–69. (Plaintiff did not receive an evaluation in 2020 due to Covid-19. Test. of Boullion.)

69.     Plaintiff filed a rebuttal letter where she addresses the negative comments in the evaluation and states that she views it as retaliation. Ex. 1, at 170–71.

70.     There was no evidence introduced at trial to establish that Ms. Bennett was aware of Plaintiff's March 11, 2019 EEOC charge or was involved in the Department's response.

71.     Plaintiff has not established that "but for" engaging in protected activity, she would have been promoted. Indeed, while Plaintiff contends that she was not promoted in retaliation for filing her March 11, 2019 EEOC charge, Mr. Boullion told her, as is recorded during the January 23, 2019 meeting, that he would hire another systems administrator and not fill the Assistant Director position. Thus, the failure to promote Plaintiff to Assistant Director, communicated to her before she filed her EEOC charge and at the inception of their January 23, 2019 meeting and in line with other hiring decisions made by Mr. Boullion, cannot constitute retaliation given that the decision preceded the subject activities.

## CONCLUSIONS OF LAW

1.     Plaintiff brought a claim for discrimination, harassment, and retaliation due to race under Title VII, 42 U.S.C. § 2000e, and hostile work environment and retaliation pursuant to Title VII, 42 U.S.C. § 2000e, 42 U.S.C. § 1981, and La. Rev. Stat. § 23:967.

2.     Federal question jurisdiction exists under 28 U.S.C. § 1331 and § 1367. Venue is proper in the Eastern District of Louisiana under 28 U.S.C. § 1391(b)(1) and (2).

3.      Title VII prohibits covered employers from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race . . ." *Moghalu v. Bd. of Supervisors for the Univ. of La. Sys. for Nw.*, 643 F. App'x 326, 329 (5th Cir. 2016) (quoting 42 U.S.C. § 2000e-2(a)(1)).  The same analysis applies to race discrimination and retaliation claims under Title VII and § 1981.  *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002) (citations omitted).

4.      An employer's action towards an employee will be unlawful under Title VII if the employee can demonstrate that race was a "motivating factor." *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011) (citing 42 U.S.C. § 2000e-2(a)(1), e-2(m)).  The applicable standard governing a § 1981 claim is "but for" the employee's race, not race as a motivating factor.  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

5.      Under Title VII, a charge of discrimination filed with a state or local agency must be filed within 300 days after the alleged unlawful employment practice occurred.  42 U.S.C. § 2000e-5(e)(1).  "[D]iscrete discriminatory acts are not actionable if time barred, even when they relate to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Goring v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 414 F. App'x 630, 632–33 (5th Cir. 2011); *Hartz v. Adm'rs of Tulane Educ. Fund*, 275 F. App'x 281, 289 (5th Cir. 2008).

6.      Unlike a Title VII claim based on a discrete act, the continuing violation doctrine will apply to a Title VII claim for hostile environment because that claim arises from the "cumulative effect of individual acts," some of which "may not be actionable on [their] own." *Morgan*, 536 U.S. at 115; *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 583–84 (5th Cir. 2020). Under the continuing violation doctrine, the filing clock does not begin running with the first act,

because at that point the plaintiff has no claim, nor does the claim expire as to that first act because the full course of conduct is the actionable infringement. *Sewell*, 974 F.3d at 584 (citation omitted). If "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117.

7.      The Supreme Court expressly enforced the 300–day time bar for Title VII discrimination claims against "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" because they are "easy to identify" and each "constitutes a separate actionable 'unlawful employment practice.'" *Morgan*, 536 U.S. at 113–14. Thus, any claim based on a "discrete act" occurring more than 300 days before the March 11, 2019 EEOC charge is time barred and not actionable, even if related to acts alleged in a timely filed charge. *Goring v. Bd. of Supervisors of La. State Univ. Agr. & Mech. Coll.*, 414 F. App'x 630, 633 (5th Cir. 2011). In contrast, a hostile work environment claim may be based on events occurring more than 300 days before the EEOC charge if any act contributing to the claim occurs within 300 days of the filing of the EEOC charge. *Morgan*, 536 U.S. at 113–14.

8.      Any potential Title VII claim for failure to promote occurring more than 300 days before the filing of the EEOC charge is untimely and barred as a matter of law.

9.      Section 1981 does not contain its own statute of limitations. Instead, courts must apply the limitations period applicable to similar claims under state law. For § 1981 claims in Louisiana, the Fifth Circuit applies Louisiana's one-year prescriptive period for torts. *Body by Cook, Inc. v. State Farm Mut. Auto. Ins. Co.*, 355 F. Supp. 3d 533, 539–40 (E.D. La. 2018) (citing *Del. State Coll. v. Ricks*, 449 U.S. 250, 255 n. 5 (1980); *Braden v. Tex. A & M Univ. Sys.*, 636 F.2d 90, 92 (5th Cir. 1981) ("[F]ederal courts apply the state law statute of limitations governing an

analogous state cause of action"); *Mitchell v. Crescent River Port Pilots Ass'n*, 265 F. App'x 363, 367–68 (5th Cir. 2008); *Johnson v. Crown Enters., Inc.*, 398 F.3d 339, 341–42 (5th Cir. 2005)).

10.     Although state law governs the limitations period, federal law determines when a civil rights action accrues (i.e., when the statute of limitations begins to run).  For a § 1981 employment discrimination claim, the limitation period commences when the plaintiff knows or reasonably should know that the challenged discriminatory act has occurred. (i.e., when plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured).  *Body by Cook, Inc.*, 355 F. Supp. 3d at 539–40 (citing *Perez v. Laredo Junior Coll.*, 706 F.2d 731, 733 (5th Cir. 1983); *Burrell v. Newsome*, 883 F.2d 416, 418 (5th Cir. 1989); *McWilliams v. Escambia Cty. Sch. Bd.*, 658 F.2d 326, 330 (5th Cir. 1981); *Jones v. Alcoa, Inc.*, 339 F.3d 359, 364 (5th Cir. 2003); *Piotrowski v. City of Hous.*, 237 F.3d 567, 576 (5th Cir. 2001) (quoting *Russell v. Bd. of Trustees*, 968 F.2d 489, 493 (5th Cir. 1992))).  Plaintiff filed her § 1981 suit within a year of her alleged discriminatory acts: letter of reprimand placed in her file on February 1, 2019 (after her January 2019 meeting with Mr. Boullion) and not being promoted in July 2019 after Ms. Bennett retired and vacated the Assistant Director position.  However, any claim based on failure to promote occurring more than one-year before suit is time-barred.

### Race Discrimination:  Hostile Environment

11.     Federal discrimination laws are not a general civility code prohibiting all types of harassment in the workplace.  *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80–81 (1998) (stating in gender discrimination case that Title VII is not a general civility code and only covers conduct which a reasonable person would find hostile or abusive considering all the circumstances).  Thus, personality conflicts are not the business of the federal courts.  *Dixon v. Henderson*, 186 F. App'x 426, 428 (5th Cir. 2006) ("[A]lleged mistreatment was caused by a

personality conflict with his supervisor, not animus based upon race or gender."); *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 440 n. 4 (5th Cir. 2012) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("'[S]lights or minor annoyances . . . [and] personality conflicts at work that generate antipathy . . . are not actionable' under Title VII"); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) ("Discourtesy or rudeness . . . will not amount to discriminatory changes in 'terms and conditions of employment'"); *Gonzales v. Geren*, No. 07-242, 2009 WL 522935, at *13 (W.D. Tex. Jan. 12, 2009) (holding "[a] supervisor's bad temper and abrasive personality towards a subordinate employee, particularly one with a long record of personality conflicts with past supervisors, do not" constitute actionable harassment under Title VII).

12.     An action for harassment in violation of federal law requires the plaintiff to demonstrate "that the harassment created a hostile or abusive working environment" based on the protected characteristic. *See, e.g.*, *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005); *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) ("A plaintiff may establish a Title VII violation based on race discrimination creating a hostile work environment."). The claim embodies a series of criteria that identify extremely insensitive conduct against a protected class, "conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995).

13.     To establish a hostile work environment claim, Plaintiff must demonstrate that:

(1) she is member of a protected group;
(2) she was the victim of uninvited racial harassment;
(3) the harassment was based on race;
(4) the harassment affected a term, condition, or privilege of her employment; and
(5) her employer knew or should have known of the harassment and failed to take prompt remedial action.

*Stingley v. Watson Quality Ford*, 836 F. App'x 286, 288 (5th Cir. 2020); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). The same standard applies to assessing a hostile environment claim under § 1981. *See, e.g., Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 283 n. 1 (5th Cir. 2015) (stating that discrimination claims under § 1981 are evaluated under the same analytical framework as Title VII claims).

14.     "To affect a term, condition, or privilege of employment, the harassment 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ramsey*, 286 F.3d at 268; *Price v. Wheeler*, 834 F. App'x 849, 859 (5th Cir. 2020); *Aryain v. Wal-Mart Stores Tex LP*, 534 F.3d 473, 479 (5th Cir. 2008) (citation omitted); *see also E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 453 (5th Cir. 2013) (quoting *Lauderdale v. Tex. Dep't of Crim. Just., Inst. Div.*, 512 F.3d 157, 162–63 (5th Cir. 2007)). "[W]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).

15.     The alleged conduct "must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (citation omitted); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). To determine whether the conduct was objectively offensive, the totality of circumstances is considered, including: (1) the frequency of the conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an

employee's work performance." *WC&M Enters., Inc.*, 496 F.3d at 399 (citing *Harris*, 510 U.S. at 23; *Harvill*, 433 F.3d at 435–36) ("No single factor is determinative.  In short, a showing that the employee's job performance suffered is simply a factor to be considered . . . a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim as well as a continuous pattern of much less severe incidents of harassment."); *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).

16.     A plaintiff asserting a Title VII claim must exhaust administrative remedies before pursuing his claim in district court.  42 U.S.C. § 2000e.  A lawsuit stemming from EEOC charges is limited in scope to the EEOC investigation that could reasonably be expected to grow out of the charge of discrimination.  *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir. 1993) (citing *Fellows v. Universal Rest.*, 701 F.2d 447, 451 (5th Cir. 1981)).  A claim is not reasonably expected to grow out of a plaintiff's charge of discrimination if the claim is not alleged in the charge itself. *Ellzey v. Cath. Charities Archdiocese of New Orleans*, 833 F. Supp. 2d 595, 602 (E.D. La. 2011); *Kebiro v. Walmart*, 193 F. App'x 365, 367 (5th Cir. 2006).  The scope of the inquiry is not, however, limited to the exact charge brought to the EEOC.  EEOC charges are to be given a liberal construction, especially those authored by unlawyered complainants.  *Thomas v. Tex. Dep't of Crim. Just.*, 220 F.3d 389, 395 (5th Cir. 2000); *Young v. City of Houston*, 906 F.2d 177, 179 (5th Cir. 1990*); Fellows v. Universal Rests., Inc.*, 701 F.2d 447, 451 (5th Cir. 1983).

17.     Plaintiff has not exhausted administrative remedies with regard to a hostile environment claim under Title VII as she did not claim hostile environment in her EEOC Charge and denied any effort to do so in her testimony.  *See* Ex. 3, at 171.

18.     A hostile environment claim may be based on § 1981, which does not include an administrative exhaustion requirement.  *See Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992

(5th Cir. 2005) ("[T]he analysis under both statutes are identical, the only substantive differences between the two statutes being their respective statute of limitations and the requirement under Title VII that the employee exhaust administrative remedies.").

19.     In considering a claim for hostile work environment under § 1981, the court looks to the same factors as the Title VII claim.  *See, e.g., Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 283 n.1 (5th Cir. 2015) ("[D]iscrimination claims brought under Section 1981 . . . are evaluated under the same analytical framework as Title VII claims.") (citations omitted); *Williams v. E.I. du Pont de Nemours & Co.*, 154 F. Supp. 3d 407, 420 (M.D. La. 2015).

20.     Initially, Ms. Bennett's three racially offensive comments/events occurring, to the best of Plaintiff's recollection, in 1994, 2010 and 2012, were all well over 300 days before Plaintiff filed her EEOC charge.  To the extent she relies on Ms. Bennett's negative evaluation completed in June 2019, that occurred after she filed her EEOC charge.  Even assuming the EEOC's investigation would have been enlarged to include that negative evaluation as a related hostile act, these four events over the course of almost 25 years does not establish a severe or pervasive hostile environment necessary to alter the conditions of her employment and create an abusive working environment.  *Cf. Brooks v. Firestone Polymers, L.L.C.*, 640 F. App'x 393 (5th Cir. 2016) (assuming an obligation to view various plaintiffs experiences together and finding that not being asked to the restroom in one instance, offensive images on company video monitors, and racial slurs and derogatory images on bathroom stalls were isolated and offhand remarks and not enough to amount to hostile work environment); *Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280 (5th Cir. 2015) (finding offensive comments made twice over two years not severe or pervasive enough to affect work performance or competence of plaintiff and thus finding no hostile work environment); *Ryals v. Am. Airlines, Inc.*, 553 F. App'x 402, 411 (5th Cir. 2014) (holding plaintiff

failed to show that the separate acts are severe or pervasive and related to establish a hostile work environment claim); *Rhines v. Salinas Const. Techs., Ltd.*, 574 Fed. App'x 362, 366 (5th Cir. 2014) (finding sufficient evidence to constitute hostile work environment when supervisor regularly called plaintiff various racial epithets at work for over a year); *Melvin v. Barr Roofing Co.*, 806 F. App'x 301, 309 (5th Cir. 2020) (ruling under totality of the circumstances a single threat of physical violence, coupled with being continuously called a racial epithet for years, constituted sufficiently severe or pervasive harassment).

21.     The three instances in which Ms. Bennett is alleged to have made offensive race-based remarks during the 25 years that they worked together are insufficient to support a claim for hostile work environment.

### Race Discrimination:  Failure to Promote

22.     Plaintiff has not presented any direct evidence of discrimination.  *See Reilly v. TXU Corp.*, 271 F. App'x 375, 379 (5th Cir. 2008) ("Direct evidence is evidence, which if believed, proves the fact in question without inference or presumption.") (citing *Jones v. Robinson Prop. Grp.*, 427 F.3d 987, 992 (5th Cir. 2005)); *Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 272 (5th Cir. 2006) ("[Direct evidence] 'includes any statement or written document showing a discriminatory motive on its face.'") (quoting *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 195 (5th Cir. 2001), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)).

23.     Derogatory comments must be analyzed according to their content and their speaker.  *Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 421 (5th Cir. 2009) (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000)).  Here, Plaintiff alleges no derogatory or race-based comments by the decisionmaker Mr. Boullion during her entire

29

employment, and no derogatory or race-based comments by Ms. Bennett, her direct supervisor, during the relevant time periods.

24.     Plaintiff may rely on circumstantial evidence to establish discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which requires her to show that she:

> (1) is a member of a protected class;
> (2) was qualified for the position sought;
> (3) she was not promoted; and
> (4) the employer continued to seek or promoted applicants with Plaintiff's qualifications and outside Plaintiff's protected class.

*Huang v. Huang,* No. 20-50445, 2021 WL 519411, at *5 (5th Cir. Feb. 10, 2021) (citing *Blow v. City of San Antonio,* 236 F.3d 293, 296 (5th Cir. 2001)); *Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 347 (5th Cir. 2013) (citing *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002)); *see generally Roberson-King v. La. Workforce Comm'n*, 904 F.3d 377, 381 (5th Cir. 2018); *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009); *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006); *Ross v. Univ. of Tex. at San Antonio*, 139 F.3d 521, 525 (5th Cir. 1998).

25.     As an African American, Plaintiff falls within a protected class under Title VII. *Lyles v. Tex. Alcohol Beverage Comm'n*, 379 F. App'x 380, 383 (5th Cir. 2010).

26.     To the extent Plaintiff purports to assert a claim for failure to promote to the Systems Analyst position that Mr. Boullion eliminated in 2002 after Ms. Bennett's promotion, that claim would be time-barred given that this occurred approximately 17 years before Plaintiff filed the EEOC charge underlying this suit.  Further, Defendant articulated a legitimate business reason for elimination of that position (i.e., with the purchase of commercial software, it no longer needed a Systems Analyst to perform high-level software design and development) and Plaintiff offered no evidence that the decision to eliminate this position was pretext for preventing Plaintiff from

obtaining this position due to race. *See Johnson v. David Wade Corr. Facility*, 410 F. App'x 735, 737 (5th Cir. 2010) (affirming summary judgment on failure to promote claim where employer converted position due to institutional needs and finding plaintiff did not demonstrate that the institutional decision was mere pretext for racial discrimination, rather just based on plaintiff's subjective beliefs).

27.    Plaintiff's burden of demonstrating that she was qualified for the Assistant Director position requires that she provide evidence that she met the objective qualifications for the position. *Stancu v. Hyatt Corp./Hyatt Regency Dallas*, 791 F. App'x 446, 450 (5th Cir. 2019) ("A plaintiff's burden of demonstrating that [she] was qualified for the position for which [she] was not promoted is not onerous."). Although Plaintiff provided evidence as to her qualifications, she provided no evidence as to the job qualification requirements for the Assistant Director position.

28.    Plaintiff's burden requires evidence that the employer continued to seek or promoted another individual with Plaintiff's qualifications for the position at issue. *Smith v. Home Depot U.S.A., Inc.*, 102 F. Supp. 3d 867, 876 (E.D. La. 2015) (citing *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004)). Plaintiff has not established that Defendant has continued to seek or promoted another individual with Plaintiff's qualifications for the position at issue.

29.    If the plaintiff carries her initial burden under *McDonnell Douglas*, which Plaintiff has not for failure to demonstrate that she was qualified for Assistant Director position and that Defendant sought or promoted another individual outside her protected class to Assistant Director position, and establishes a prima facie case of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination. *Harville v. City of Houston*, 945 F.3d 870, 875 (5th Cir. 2019).

31

30.     "An employer's subjective reason for not selecting a candidate, such as a [clearly articulated] subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection." *Inocencio v. Montalvo*, 774 F. App'x 824, 831 (5th Cir. 2019) (quoting *Alvarado v. Tex. Rangers*, 492 F.3d 605, 616 (5th Cir. 2007)).  The Fifth Circuit has repeatedly recognized that a subjective decision making-process does not raise inferences of discriminatory conduct.  *See, e.g.*, *Criner v. Texas--New Mexico Power Co.*, 470 F. App'x 364, 370 (5th Cir. 2012) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990 (1988); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973)).

31.     When the employer satisfies its burden of production by articulating a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination "simply drops out of the picture" and plaintiff must prove that the defendant intentionally discriminated against her because of her protected characteristic.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993) (citations omitted).

32.     The Plaintiff may carry the burden by proving by a preponderance of the evidence that the employer's proffered reasons were not its true reasons, but were "a pretext for discrimination, or that a 'motivating factor' of the employment decision was the plaintiff's protected characteristic." *Sacchetti v. Optiv Sec., Inc.*, 819 F. App'x 251, 253–54 (5th Cir. 2020) (citing *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016) (quoting *McDonnell Douglas Corp*, 411 U.S. at 802)).  This is done either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence, i.e., that the employer's articulated reasons were not its true reasons, but are a pretext for discrimination. *Harville v. City of Houston*, 945 F.3d 870, 875 (5th Cir. 2019) (citation omitted); *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 476 (5th Cir. 2015) (citing *Squyres v. Heico Cos.*, 782 F.3d

224, 231 (5th Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000))).  Based on Mr. Boullion's testimony and the other evidence, I cannot find that his stated reasons for his decision not to promote Plaintiff to Assistant Director are pretextual.

33.     The issue at the pretext stage is not whether the employer's reason was actually correct or fair, but whether the decisionmakers honestly believed the stated reason.  *Harville*, 945 F.3d at 877 (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002) ("The issue at the pretext stage is whether [employer's] reason, even if incorrect, was the real reason for [employee's] termination.")); *Goudeau*, 793 F.3d at 476 (citation omitted).  Mr. Boullion honestly believes his impressions of Plaintiff's ability to work with others and her ability to handle criticism.

34.     A plaintiff's prima facie case, "combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *see also Williams v. Waste Mgmt., Inc.*, 818 F. App'x 315, 319 (5th Cir. 2020).  A plaintiff is not, however, relieved of her burden to present evidence that will permit a rational factfinder to infer intentional discrimination.  *Harville*, 945 F.3d at 877 (citing *Reeves*, 530 U.S. at 153 (noting that the "ultimate question" in cases alleging employment discrimination "is whether the plaintiff was the victim of intentional discrimination") (internal quotation marks and alterations omitted)).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Harville*, at 877 n.26 (quoting *Reeves*, 530 U.S. at 153).

35.     The anti-discrimination laws do not allow a court to sit as a super-personnel department that reexamines an entity's business decisions or the wisdom of those decisions, so long as those decisions are not the result of discrimination. *Eyob v. Mitsubishi Caterpillar Forklift*

*Am., Inc.*, 745 F. App'x 209, 212 (5th Cir. 2018) (citations omitted); *Harris v. Double G. Coatings, Inc.*, No. 96-60485, 1997 WL 255619, at *2 n.4 (5th Cir. May 5, 1997) (citing *Ruby v. Springfield R-12 Pub. Sch. Dist.*, 76 F.3d 909, 912 n.7 (8th Cir. 1996)). The court should not weigh the wisdom of particular employment decisions nor question every management decision and work assignment. The single issue is whether the employer's decision was motivated by discrimination. *See McVille v. Inter-Community Healthcare, Inc.*, 460 F. App'x 353, 355 (5th Cir. 2012) (citing *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995); *Deines v. Tex. Dep't of Protective & Regul. Servs.*, 164 F.3d 277, 281 (5th Cir. 1999)).

36.     To prove disparate treatment, Plaintiff must establish, among other things, that "others similarly situated were treated more favorably." *Reyna v. Donely*, 479 F. App'x. 609, 611 (5th Cir. 2012) (citations and quotations omitted).

37.     An employee must proffer a comparator who was treated more favorably "under nearly identical circumstances," which is satisfied when "the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Id.* (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) ("[I]t is sufficient that the ultimate decisionmaker as to the employees' continued employment is the same individual, even if the employees do not share an immediate supervisor. Each employee's track record at the company need not comprise the identical number of identical infractions, albeit these records must be comparable.")); *see also Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001) (citing *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (finding not identical when employees action were reviewed by different supervisors); *Smith v. Wal-Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir. 1990) (stating employees who engaged in different violations

of company policy were not nearly identical); *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 571

(5th Cir., Unit B 1982) (finding employees engaged in different conduct were not similarly

situated)). "Nearly identical" does not mean identical in every way, but even violations of the

same work rule are not "nearly identical" when the degree of violations differ. *Lee*, 574 F.3d at

260–61; *Smith*, 891 F.2d at 1180. Plaintiff has not identified a proper comparator.

### Retaliation/Whistleblower

38.     Title VII's antiretaliation provisions protect an individual from retaliation that

produces an injury or harm. *Davis v. Fort Bend Cty.*, 765 F.3d 480, 490 (5th Cir. 2014) (citing

*Burlington N. & Santa Fe Ry. Co. v. White*, 126 U.S. 53, 67 (2006)).

39.     To establish a retaliation claim, Plaintiff must show that:

(1) she engaged in a protected activity;
(2) an adverse employment action occurred; and
(3) a causal connection exists between the protected act and the adverse action (i.e., the
protected activity was the "but for" cause of the alleged retaliation).

*Everett v. Cent. Miss., Inc. Head Start Prog.*, 444 F. Appx 38, 43 (5th Cir. 2011); *Septimus v. Univ.*

*of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005); *Harvill v. Westward Comm., L.L.C.*, 433 F.3d 428,

439 (5th Cir. 2005).

40.     "An employee has engaged in activity protected by Title VII if she has either

(1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing'

under Title VII." *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (quoting 42 U.S.C. §

2000e-3(a)); *see also Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372–

73 (5th Cir. 1998) (quoting 42 U.S.C. § 2000e-3(a)).

41.     "[T]he opposition clause does not require opposition alone; it requires opposition

of a practice made unlawful by Title VII." *E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 240

(5th Cir. 2016) (citation omitted). Thus, an employee "cannot simply complain that she received unfair or undesirable treatment." *Carter v. Target Corp.*, 541 F. App'x 413, 418 (5th Cir. 2013) (citing *Richard v. Cingular Wireless LLC*, 233 F. App'x 334, 338 (5th Cir. 2007)).

42.    An employee's informal complaint to an employer may constitute participation in a protected activity. *Amanduron v. Am. Airlines*, 416 F. App'x 421, 424 (5th Cir. 2011) (citations omitted). The employee must, however, reference a discriminatory employment practice to constitute a protected activity. *Carter*, 541 F. Appx. at 418 (citing *Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x 485, 493 (5th Cir. 2011)).

43.    "[A] vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity." *Davis*, 448 F. App'x 485 at 493 (finding that court properly concluded that a complaint of a "hostile work environment" did not constitute protected activity within the meaning of Title VII because "this complaint lacked a racial or gender basis"); *see also Harris-Childs v. Medco Health Sols., Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006) (affirming that plaintiff failed to show that she engaged in protected activity under Title VII because, while Plaintiff complained of unfair treatment, she did not demonstrate that she put the employer on notice that her complaint was based on racial or sexual discrimination); *Tratree v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 396 (5th Cir. 2008) (affirming summary judgment in favor of defendant when plaintiff complained of unfair treatment but "never referred to the discriminatory treatment as age-based"); *Moore v. United Parcel Serv., Inc.*, 150 F. App'x 315, 319 (5th Cir. 2005) (affirming summary judgment because plaintiff did "not engage in a protected activity, as his grievance did not oppose or protest racial discrimination or any other unlawful employment practice under Title VII. Rather, [he] simply complained that [defendant] had

36

violated its agreement with the union. [His] grievance . . . made no mention of race discrimination . . . .").

44.     Repeatedly asking about a raise, without any reference to claims of racially disparate treatment, is insufficient to constituted protected activity. *Foster v. Ferrellgas, Inc.*, 834 F. App'x 88, 92 (5th Cir. 2020).  Plaintiff has not identified any informal complaint, including her January 23, 2019 meeting with Mr. Boullion, that would constitute protected activity because she fails to present evidence of any meeting where she asserted that any alleged unfair treatment was due to her race.  While Plaintiff mentions racial slurs by Ms. Bennett in that meeting (ECF No. 55, at 3), she does not tell Mr. Boullion at any other time in the meeting that she views his actions in not promoting her as racial discrimination.  In response to his asking her, "So, because now [Ms. Bennett has] done something . . . I'm disrespecting you?" Plaintiff states, "No, I'm not, no, no . . ." and makes no mention of racial discrimination.  *Id.* at 3.

45.     The filing of an EEOC complaint is a protected activity within the meaning of the statute. *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 330 (5th Cir. 2004) (citing *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000)).

46.     To establish retaliation, Plaintiff must prove a "materially adverse" action that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 945 (5th Cir. 2015) (quoting *White*, 548 U.S. at 57); *see also Sharp v. City of Hous.*, 164 F.3d 923, 933 (5th Cir. 1999). This standard does not encompass the "'petty slights, minor annoyances, and simple lack of good manners' that employees regularly encounter in the workplace." *Aryain v. Wal–Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008) (quoting *White*, 548 U.S. at 68).  This requirement of

materiality is intended to separate "significant from trivial harms." *Aryain*, 534 F.3d at 484 (quoting *White*, 548 U.S. at 68); *Keenan v. Tejeda*, 290 F.3d 252, 258 n.4 (5th Cir. 2002) (citations omitted); *see also Marchman v. Crawford*, 726 F. App'x 978, 985 (5th Cir. 2018).

47.     To determine whether an action is materially adverse, courts must look to indicia such as whether the action affected "job title, grade, hours, salary, or benefits" or caused "a diminution in prestige or change in standing among . . . co-workers." *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009). The focus is on the objective qualities of the positions, rather than the employee's subjective preference for one position over another. *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 771 n.8 (5th Cir. 2001). Thus, the action must be objectively adverse: "A plaintiff's subjective perception that a demotion has occurred is not enough." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 614 (5th Cir. 2007) (quotation omitted).

48.     Assuming that a negative evaluation is materially adverse (*see Murray v. Louisiana-Div. of Admin. Off. of Plan. & Budget*, 439 F. App'x 349, 351 n.2 (5th Cir. 2011) (declining to resolve question of whether a negative evaluation is materially adverse for purposes of a retaliation claim); *Klebe v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 450 F. App'x 394, 396 (5th Cir. 2011) (finding defendant waived objection to jury instruction that negative evaluation qualifies as basis of retaliation claim)), Ms. Bennett (not Mr. Boullion) prepared Plaintiff's 2019 evaluation.

49.     Plaintiff did not introduce any evidence that Ms. Bennett was aware that she filed an EEOC charge in March 2019. *Umoren v. Plano Indep. Sch. Dist.*, 457 F. App'x 422, 427 (5th Cir. 2012) (affirming summary judgment where plaintiff provided no evidence that evaluator was aware of discrimination or retaliation claim when he completed the evaluation).

50.     There must be a causal link between the protected activity and the adverse act, which requires that the adverse employment action would not have occurred "but for" the protected activity.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

51.     Mr. Boullion told Plaintiff he was hiring another systems administrator rather than replacing the Assistant Director position at the beginning of their meeting in January 2019 and Plaintiff did not file her EEOC charge until March 2019.  Adverse action that occurs before a "protected activity" cannot form the basis of a retaliation claim.  *Watkins v. Tex. Dep't of Crim. Just.*, 269 F. App'x 457, 462 (5th Cir. 2008).

52.     Under the Louisiana whistleblower statute, La. Rev. Stat. § 23:967, "An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law . . . [o]bjects to or refuses to participate in an employment act or practice that is in violation of law."  La. Rev. Stat. § 23:967(A)(3).  "'Reprisal' includes firing, layoff, loss of benefits, or any discriminatory action the court finds was taken as a result of an action by the employee that is protected under Subsection A of this Section; however, nothing in this Section shall prohibit an employer from enforcing an established employment policy, procedure, or practice or exempt an employee from compliance with such." La. Rev. Stat. § 23:967(C)(1).

53.     To establish a claim under La. Rev. Stat. § 23:967, a plaintiff must show that "(1) [the defendant] violated the law through a prohibited workplace act or practice; (2) [plaintiff] advised [defendant] of the violation; (3) [plaintiff] then refused to participate in the prohibited practice or threatened to disclose the practice; and (4) [plaintiff] was fired as a result of [the] refusal to participate in the unlawful practice or threat to disclose the practice."  *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (citing *Hale v. Touro Infirmary*, 2004–0003 (La. App. 4 Cir. 11/3/04); 886 So.2d 1210, 1216).

39

54.     Plaintiff must establish that the employer engaged in workplace conduct constituting an actual violation of state law.  *Encalarde v. New Orleans Ctr. for Creative Arts/Riverfront*, 2014-2430 (La. 2/13/15), 158 So. 3d 826, 826; *see also Herster v. Board of Supervisors of La. State Univ.*, 887 F.3d 177, 187–88 (5th Cir. 2018); *Malin v. Orleans Par. Commc'ns Dist.*, 718 F. App'x 264, 273 (5th Cir. 2018) ("To state a claim under [the Louisiana Whistleblower Statute], an employee must show that his employer retaliated for reporting an actual violation of law."); *Wilson v. Tregre*, 787 F.3d 322, 326 (5th Cir. 2015) ("To qualify for protection under the Louisiana Whistleblower Statute, a plaintiff must prove that his employer committed an actual violation of state law.") (citing *Ross v. Oceans Behav. Hosp.*, 14-368 (La. App. 5 Cir. 11/25/14), 165 So. 3d 176, 180; *Mabry v. Andrus*, 45,135 (La. App. 2 Cir. 4/14/10), 34 So. 3d 1075, 1081).  Reports of "possible" violations of state law are insufficient.  *LaRavia v. Cerise*, 462 F. App'x 459, 464 (5th Cir. 2012).

55.     A plaintiff must establish that the Defendant, not simply its employees, violated state law.  *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (citing *Fondren v. Greater New Orleans Expressway Comm'n*, 03–1383 (La. App. 5 Cir. 4/27/04), 871 So.2d 688, 691 ("The Louisiana Whistleblower Statute targets serious employer conduct that violates the law."); *cf. Dillon v. Lakeview Reg'l Med. Ctr. Auxiliary, Inc.*, 2011–1878 (La. App. 1 Cir. 6/13/12), 2012 WL 2154346, at *5 & n. 8 (observing that "it could be concluded that the employer must be the actor who violated the law, in order for there to be a cause of action under" § 23:967, and that "there is no indication" that the statute "would encompass unauthorized acts of . . . employees").

56.     "A whistleblower claim . . . requires proof of a causal link between the plaintiff's disclosure of a violation of state law and any acts of reprisal." *Watkins v. Recreation & Park Comm'n,* 594 F. App'x 838, 843 (5th Cir. 2014).

57.     It is appropriate to use federal jurisprudence associated with Title VII in analyzing a claim under La. Rev. Stat. § 23:967. *Rayborn v. Bossier Par. Sch. Bd.*, 881 F.3d 409, 415 (5th Cir. 2018).

58.     Plaintiff has not introduced evidence to establish any elements, such as Defendant's violation of state law or Plaintiff's refusal to participate in the prohibited activity, to demonstrate a violation of La. Rev. Stat. § 23:967.

59.     Given the totality of the evidence, I cannot conclude that Plaintiff has been subjected to race-based discrimination or retaliation in connection with Mr. Boullion's decision not to promote her or that Mr. Boullion's legitimate, nondiscriminatory reasons for his decision were mere pretext for race discrimination or retaliation.

Accordingly, IT IS ORDERED that judgment be entered in favor of Defendant St. Tammany Parish School Board and against Plaintiff Verlean W. Randolph, dismissing Plaintiff's claims with prejudice.

New Orleans, Louisiana, this __17th__ day of May, 2021.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE